ORIGINAL



UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

5: 05 -CV- 0314

THE ONONDAGA NATION,

LEK / DRH

Plaintiff,

v.                                              Civil Action No.

THE STATE OF NEW YORK; GEORGE PATAKI, IN
HIS INDIVIDUAL CAPACITY AND AS GOVERNOR
OF NEW YORK STATE; ONONDAGA COUNTY;
THE CITY OF SYRACUSE; HONEYWELL
INTERNATIONAL, INC.; TRIGEN SYRACUSE
ENERGY CORPORATION; CLARK CONCRETE
COMPANY, INC.;VALLEY REALTY DEVELOPMENT
COMPANY, INC.; HANSON AGGREGATES NORTH
AMERICA,

Defendants.

COMPLAINT FOR DECLARATORY JUDGMENT

I. Nature of the Action

1.  The Onondaga people wish to bring about a healing between themselves and all others who live in this region that has been the homeland of the Onondaga Nation since the dawn of time.  The Nation and its people have a unique spiritual, cultural, and historic

relationship with the land, which is embodied in *Gayanashagowa*, the Great Law of Peace. This relationship goes far beyond federal and state legal concepts of ownership, possession, or other legal rights. The people are one with the land and consider themselves stewards of it. It is the duty of the Nation's leaders to work for a healing of this land, to protect it, and to pass it on to future generations. The Onondaga Nation brings this action on behalf of its people in the hope that it may hasten the process of reconciliation and bring lasting justice, peace, and respect among all who inhabit this area.

2. This is an action to declare that certain lands are the property of the Onondaga Nation and the Haudenosaunee, having been unlawfully acquired by the State of New York in violation of the federal Indian Trade and Intercourse Acts, now codified at 25 U.S.C. §177, and in violation of the United States Constitution, the Treaty of Fort Stanwix of 1784, and the Treaty of Canandaigua of 1794.

## II. Jurisdiction and Venue

3. The jurisdiction of this Court is invoked pursuant to 28 U.S.C. §§1331, 1337, 1343 and 1362. Venue lies in this District under 28 U.S.C. §1391(b).

4. Plaintiff's claim for relief arises under federal common law; the United States Constitution; the Indian Trade and Intercourse Acts of 1790, 1793, 1796, 1799, 1802, and 1834, now codified at 25 U.S.C. §177; under the Treaty of Fort Stanwix of 1784, 7 Stat. 15; and the Treaty of Canandaigua of 1794, 7 Stat. 44.

## III. Parties

5. The plaintiff ONONDAGA NATION is an Indian nation recognized by the United States through the Secretary of the Interior of the United States. It is, and has been at

2

all relevant times, an "Indian nation" within the meaning of the federal Indian Trade and Intercourse Acts of 1790 and later, now 25 U.S.C. §177. The citizens of the Onondaga Nation reside principally on their territory or "reservation" south of Nedrow, New York. The Nation brings this action by authority of the Onondaga Council of Chiefs, the sole government of the Onondaga Nation. The government of the Onondaga Nation is recognized by the United States through the Secretary of the Interior. The relationship of the Onondaga Nation to the United States has never been terminated.

6. . The Onondaga Nation sues on its own behalf and on behalf of and with the authority of the Haudenosaunee. The Haudenosaunee is a confederacy, originally, of five Indian nations: the Onondaga Nation, Mohawk Nation, Oneida Nation, Cayuga Nation, and Seneca Nation. The Tuscarora Nation joined the Haudenosaunee in approximately 1712. It is called, in English, the "Six Nations Iroquois Confederacy." The capital or central Council Fire of the Confederacy is at Onondaga. The Onondagas are the firekeepers of the Haudenosaunee. The Haudenosaunee entered into two treaties recognized as valid by the United States: the Treaty of Fort Stanwix of 1784 and the Treaty of Canandaigua of 1794. This action is brought by authority of the Council of Chiefs of the Haudenosaunee as well as by authority of the Council of Chiefs of the Onondaga Nation. The Haudenosaunee does not object to this case proceeding in its absence.

7. The defendant STATE OF NEW YORK is the purported original purchaser of the land that is the subject of this action, pursuant to transactions described in paragraphs 25 through 38 below. The State continues to claim an interest in and to occupy certain portions of this land. The address of the State of New York is: Attorney General Eliot L. Spitzer, Department of Law, State Capital, Albany, New York 12224-0341.

8. The plaintiff has formally requested the State of New York to waive whatever immunity it may claim to this suit in the interest of fairness toward the other defendants and in the interest of justice.

9. The United States has been requested to file suit against the State of New York asserting a claim identical to that asserted in this complaint. Such a suit by the United States would breach the immunity that New York State may assert. The United States has filed supporting suits or intervened in the Indian Trade and Intercourse Act claims in New York State in behalf of the Senecas, Cayugas, Mohawks, and Oneidas: for example in Seneca Nation, *et al.* v. The State of New York, *et al.* (2nd Cir., No. 02-6185(L)); The Cayuga Indian Nation, *et al.* v. Pataki, *et al.* (2nd Cir., No. 02-6111(L)); Canadian St. Regis Band of Mohawk Indians, *et al.* v. The State of New York, *et al.* (NDNY, 5:82-CV-783); Oneida Indian Nation of New York State, *et al.*, v. The State of New York, *et al.* (NDNY, 74-CV-187).

10. Defendant Governor GEORGE PATAKI is sued here in his official capacity as the Governor of New York and in his individual capacity in that he is acting beyond the scope of his constitutional and other authority in unlawfully claiming an interest in the plaintiff's lands. Governor George Pataki's address is: Executive Chamber, State Capital, Albany, New York 12224.

11. Defendant ONONDAGA COUNTY is a county of New York and occupies or claims an interest in certain portions of the subject land. Onondaga County's address is: Anthony Rivizzigno, Onondaga County Attorney, Civic Center, Syracuse, New York 13202.

12. Defendant CITY OF SYRACUSE is a municipality which occupies or claims an interest in certain portions of the subject land. The address of the City of Syracuse is: Terri Bright, Syracuse Corporation Counsel, City Hall, Syracuse, New York 13202

13. Defendant HONEYWELL INTERNATIONAL, INC. is a corporation which occupies or claims an interest in certain portions of the subject land, in particular several industrial properties along the southwest shore of Onondaga Lake, where, from the 1880s until the 1980s, Honeywell and its predecessor companies operated various chemical plants, which included the Main Plant, the Willis Avenue Plant and the Bridge Street Plant. These industrial operations of Honeywell and its predecessor companies have degraded the land to which the Onondaga Nation holds title under federal law. The address of Honeywell International, Inc., is: 101 Columbia Road, PO Box 2105, Morristown, New Jersey 07962.

14. Defendants CLARK CONCRETE COMPANY, INC. and its subsidiary, VALLEY REALTY DEVELOPMENT COMPANY, INC. are corporations which occupy or claim an interest in certain portions of the subject land, in particular the Tully gravel mine, which is located on the north face of the Tully valley moraine and which has negatively impacted some of the head waters of Onondaga Creek. This mining operation has degraded the land to which the Onondaga Nation holds title under federal law. This mining area, near Solvay Road and Tully Valley Road in Tully, New York, also contains areas of extreme archeological and cultural sensitivity for the Onondaga Nation. The address of both Clark Concrete Company, Inc., and Valley Realty Development Company, Inc. is: 434 East Brighton Avenue, Syracuse, New York 13210

15. Defendant HANSON AGGREGATES NORTH AMERICA and its subsidiaries are corporations which occupy or claim an interest in certain portions of the subject land, in particular the property commonly referred to as the "Jamesville quarry", which sprawls across portions of the towns of DeWitt and LaFayette and is one of the largest open pit mines in New York State. Despite the vast areas that have been devastated by this mining operation, there has been little or no reclamation of the land. Further, this mining operation has degraded the land to which the Onondaga Nation holds title under federal law. The address of Hanson Aggregates North America is: 8505 Freeport Parkway, Suite 138, Irving, Texas 75063.

16. Defendant TRIGEN SYRACUSE ENERGY CORPORATION occupies or claims an interest in certain portions of the subject land, in particular an energy "cogeneration" plant in the Town of Geddes. This plant burns a combination of coal and plastic/paper waste, or "fluff", and its emissions include large quantities of hydrochloric acid and quantities of dioxins. Trigen has polluted the air and degraded the land to which the Onondaga Nation holds title under federal law. The address for Trigen Syracuse Energy Corporation is: 56 Industrial Drive, Syracuse, New York 13204-1091.

## IV. The Subject Land

17. The land which is the subject of this action is the aboriginal property of the Onondaga Nation. This aboriginal area became part of the entire territory of the Haudenosaunee when the Haudenosaunee was formed.

18. The aboriginal territory of the Onondaga Nation, so far as it lies within what is known as the State of New York, is an area or strip of land running generally north and south and lying between the aboriginal land of the Oneida Nation on the east and the Cayuga

Nation on the west. The strip runs from the St. Lawrence River, along the east side of Lake Ontario and south as far as the Pennsylvania border. The strip varies in width from about 10 miles to more than 40 miles.

19. For identification purposes only, a map showing the general area of land is attached as Exhibit A. The precise locations of the boundaries are indeterminate at this time.

20. The precise areas at issue in this action are those parcels within the aboriginal area above described in which defendants claim an interest.

## V. Claim for Relief

21 The preceding paragraphs are hereby incorporated by reference.

22. The land which is the subject of this action has at all times, since time immemorial, been the property of the Onondaga Nation and the Haudenosaunee. It has never been sold, ceded, or given up by any Indian nation or entity.

23. The subject land is not only aboriginal property of the Onondaga Nation and the Haudenosaunee, but it is also land recognized and secured by the Treaty of Fort Stanwix of 1768 between the Haudenosaunee and the British Crown, by the Treaty of Fort Stanwix of 1784 (7 Stat. 15) between the United States and the Six Nations, and by the Treaty of Canandaigua of 1794 (7 Stat. 44) between the United States and the Six Nations.

24. The Onondaga Nation is an Indian nation, and it has continuously existed as an Indian nation since time immemorial.

25. In September, 1788, New York State negotiated a "treaty," so-called, with individuals purporting to represent the Onondaga Nation. In fact neither the Onondaga Nation nor the Haudenosaunee authorized or consented to the "treaty."

7

26. This "treaty" purported to cede and grant to the State of New York all the lands of the Onondaga Nation, but provided that the Onondagas would hold forever a tract of land described as follows:

> all that tract of land beginning at the southerly end of the Salt Lake at the place where the river or stream on which the Onondagos now have their village empties into the said lake, and runs from the said place of beginning east three miles, thence southerly according to the general course of the said river until it shall intersect a line running east and west at the distance of three miles south from the said village, thence from the said point of intersection west nine miles, thence northerly parallel to the second course above mentioned until an east line will strike the place of beginning, and thence east to the said place of beginning.

27. Pursuant to this purported "treaty," Onondaga Lake and the land one mile around it were to remain for the common benefit of the people of the State of New York and the Onondagas for the sole purpose of making salt.

28. Because of the strong and persistent protests of the Chiefs and others of the Onondaga Nation against the purported treaty of 1788, the State of New York called a meeting in the Spring of 1790 for the purpose of resolving these complaints and ratifying the 1788 "treaty."

29. On June 16, 1790, certain persons purporting to represent the Onondaga Nation signed a so-called "treaty" with the State of New York which purported to "ratify and confirm" the 1788 "treaty".

30. In 1790 Congress passed the Indian Trade and Intercourse Act regulating, among other things, purchases or other dealings in Indian land. Act of July 22, 1790, 1 Stat. 137. This act has been continuously in force since that time and was re-enacted in the Acts of March 1, 1793, 1 Stat, 329; Act of July 22, 1796, 1 Stat. 469, 472; Act of March 3, 1799, 1 Stat. 743,

746; Act of March 30, 1802, 2 Stat. 139, 143; Act of June 30, 1834, 4 Stat. 729, 730; Rev. Stat. §2116. This act in pertinent part provides that:

> No purchase, grant, lease or other conveyance of land, or of any title or claim thereto, from any Indian nation or tribe of Indians, shall be of any validity in law or equity, unless the same be made by treaty or conveyance entered into pursuant to the Constitution.

25 U.S.C. §177.

31. The "treaty" document signed on June 16, 1790 was recorded as required by New York State law on November 25, 1791. However, the "treaty" of June 16, 1790 was ineffective to convey title to any lands, because it could have no legal effect until it was recorded as required by state law, and at the time it was recorded, on November 25, 1791, it was in contravention of the United States Constitution, the Indian Trade and Intercourse Act of 1790, and the Treaty of Fort Stanwix of 1784.

32. Neither the "treaty" of 1788 nor the "treaty" of 1790 was approved by the New York legislature as required by a New York State statute, namely the Act of March 18, 1788, 11th Sess., Chap. 85, and as required by the New York Constitution, Article 37, until passage of the Act of April 10, 1813, 36th Sess., Chap. XCII (R.L.), §VII.

33. The purported conveyance contained in the 1788 "treaty" was a nullity and of no legal effect because of the failure of the legislature to approve the conveyance until the Act of 1813 (cited in paragraph 32 above), long after the entry into effect of the United States Constitution and the first Indian Trade and Intercourse Act.

34. The purported "treaty" signed in 1790 was a nullity and of no legal effect because of the failure of the New York legislature to approve the "treaty" until the Act of 1813

9

(cited in paragraph 32 above), and because it was in contravention of the United States Constitution, the Treaty of Fort Stanwix of 1784, and the Indian Trade and Intercourse Act of 1790.

35. Despite the passage of the Indian Trade and Intercourse Act three years earlier, the State of New York, in 1793, entered into a "treaty" with persons who the State claimed represented the Onondaga Nation. The transaction purported to release and quit claim to New York two tracts which were part of the area specifically set aside "forever" for the Onondaga Nation in the 1790 "treaty."

    A.    The first tract is described as follows:

> the first of the said Tracts begins in the East bounds of the said Reservation at a certain bass wood tree marked for seven miles south from the Northeast corner of the said Reservation and runs from the said place of beginning West to the River or Stream commonly called the Onondago Creek, on which the Onondagos now have their Village then Northerly down along the said River or Creek to the Lands appropriated for the common benefit of the people of the State of New York and of the Onondagoes and their posterity for the purpose of making Salt, Then easterly and Northerly along the said last mentioned lands to the line run from the north bounds of the said reservation Then East along the said Line to the northeast corner of the said reservation and then South along the East Bounds of the said Reservation seven miles to the place of Beginning,

    B.    The second tract is described as follows:

> And the second of the said Tracts begins at a point in the South bounds of the said Reservation Four Miles West from the Southeast corner thereof and runs from the said place of beginning North so far until an East course will strike the aforesaid Basswood tree marked for the seven miles, South from the Northeast corner of the said Reservation; then East to a point half a mile West from the aforesaid Onondago Creek, then northerly along straight lines connecting points successively at intervals of half a mile northing from each other, each of which points shall be half a mile measured West from the said Onondago Creek to the aforesaid Lands appropriated for the common benefit of the People of the State of New York and of the Onondagoes and their posterity for the purpose of making Salt, Then along the same westerly and Northerly to the Line run for the North

bounds of the said Reservation then along the said line west to the northwest corner of the said reservation, then along the West bounds thereof South to the Southwest corner thereof & then along the South bounds thereof east to the place of beginning.

36. Again, in 1795, the State of New York entered into a "treaty" with persons who the State claimed represented the Onondaga Nation. This transaction purported to convey to New York the Onondaga Nation's rights in Onondaga Lake and the lands one mile around it as well as the strip of land one-half mile wide along the west side of Onondaga Creek between Onondaga Lake and the north boundary of the Onondaga territory as supposedly diminished by the 1793 "treaty." This purported "treaty" also provided for one square mile of land within the diminished territory to be set aside for three individuals. No precise boundaries are stated in the 1795 "treaty." This third "treaty" also was entered into by the State of New York in defiance of Congress's express prohibition set forth in the Indian Trade and Intercourse Act of 1793.

37. In 1817, the State of New York entered into a fourth "treaty" with persons who the State claimed represented the Onondaga Nation. This transaction purported to convey to New York State two additional parcels contained within the area set aside "forever" for the Onondaga Nation in the 1790 "treaty":

  A. The first tract is described as follows:

All that certain Tract of land being part of the Lands reserved to them in former cessions to the said people and known as the Onondaga Residence Reservation and bounded as follows North by the north bounds of said residence Reservation East by the East bounds thereof South by the South bounds thereof and West by a line parallel to the said east bounds and at the distance of one mile and a half westward from the same--

11

B. The second tract is described as follows:

> Beginning at the south east corner of Lot Number one hundred and fifty eight which is the South West corner of Lot Number one hundred and sixty of the Tract called the Onondago Reservation in the North bounds of said residence Reservation and running thence along the same East twenty five chains, then South Sixty chains then West fifty chains then North sixty chains to said North bounds of said Residence Reservation and then along the same East Twenty five chains to the place of beginning containing Three hundred Acres --

38. Again, more than 30 years after purporting to set aside "forever" an area of land for the Onondaga Nation and more than 30 years after passage of the first Indian Trade and Intercourse Act, in 1822, the State of New York entered into a fifth "treaty" with persons who the State claimed represented the Onondaga Nation. This transaction purported to convey to the State a parcel of land as follows:

> All that certain Tract of land being part of the lands reserved to them in former cessions to the said People and known as the Onondaga residence reservation and bounded as follows to wit Beginning at the South west corner of the said residence reservation and running thence along the south bounds thereof East two miles and a half to the lands sold by the said Indians to the said People in the year One thousand eight hundred and Seventeen then along the same North half a mile then west parallel with the said South bounds two miles and a half then along the same East two miles and a half to the place of beginning containing eight hundred acres:

39. The so-called "treaties" of 1788, 1790, 1793, 1795, 1817 and 1822 were never approved or ratified by the Onondaga Nation or the Haudenosaunee. None of the purported conveyances were made by persons having authority or legal capacity to convey the land.

40. Nor were the so-called "treaties" of 1788, 1790, 1793, 1795, 1817 and 1822 ratified or approved by the United States Senate or Congress. Nor was a United States

12

Commissioner present at any of the "treaties". No part of the subject land has ever been ceded or given up pursuant to a treaty or conveyance entered into under the Constitution nor pursuant to any act of Congress.

41. The land supposedly ceded in the so-called "treaties" of 1788 and 1790 remained the property of the Onondaga Nation and Haudenosaunee because of the failure of the New York legislature to approve the "treaties" as required by New York's Constitution and the Act of 1788, and also independently because of the failure to record the 1790 treaty until after the effective date of the United States Constitution and the first Indian Trade and Intercourse Act. With enactment by Congress of the first Indian Trade and Intercourse Act in 1790, all of the property of the Onondaga Nation and the Haudenosaunee became subject to the Act's requirements. The said property has never been conveyed in compliance with the Act, and therefore it remains the property of the Onondaga Nation and the Haudenosaunee.

42. Each of the above-mentioned "treaties" between the State of New York and the Onondaga Nation is a nullity and of no legal effect. As a result, the subject land supposedly ceded in the so-called "treaties" of 1788, 1790, 1793, 1795, 1817, and 1822 remained the property of the Onondaga Nation and the Haudenosaunee.

43. The State of New York knew or should have known that its purported purchases of the lands in question, without compliance with the United States Constitution and the federal Indian Trade and Intercourse Acts, without compliance with the Act of 1788, and in contravention of the Treaties of Fort Stanwix of 1784 and Canandaigua of 1794, were void, wrongful, illegal, and of no force or effect.

44. Each of the defendants claims an interest in portions of the lands purportedly conveyed by one or more of the so-called "treaties" of 1788, 1790, 1793, 1795, 1817, and 1822. Because the defendants base their claimed interests in the subject lands on the void "treaties," the defendants have no lawful interest in the subject land.

## VI. Prayer for Relief

Wherefore, plaintiff prays for a declaratory judgment pursuant to 28 U.S.C. §2201 declaring:

A. That the purported conveyances of the "treaties" of 1788, 1790, 1793, 1795, 1817, and 1822 were and are null and void;

B. That the subject land remains the property of the Onondaga Nation and the Haudenosaunee, and that the Onondaga Nation and Haudenosaunee continue to hold title to the subject land.

Respectfully submitted,

*/s/ Robert T. Coulter*
Robert T. Coulter, Bar No. 101416
Indian Law Resource Center
602 North Ewing Street
Helena, Montana 59601
(406) 449-2006

*[signature]*

Joseph J. Heath, Bar No. 505660
716 E. Washington St.
Suite 104
Syracuse, NY 13210-1502
(315) 475-2559

Curtis G. Berkey, Bar No. 101147
Alexander, Berkey, Williams
 & Weathers, LLP
2000 Center Street, Suite 308
Berkeley, California 94704
(510) 548-7070



Approximate Area of Onondaga Nation Aboriginal Territory
(For identification purposes only)