UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

ONONDAGA NATION,

                Plaintiffs,

   v.                                           5:05-cv-0314 (LEK/RFT)

STATE OF NEW YORK, GEORGE PATAKI,
*In His Individual Capacity*, DAVID PATTERSON,
ONONDAGA COUNTY, CITY OF SYRACUSE,
HONEYWELL INTERNATIONAL, INC., TRIGEN
SYRACUSE ENERGY CORPORATION, CLARK
CONCRETE COMPANY, INC., VALLEY REALTY
DEVELOPMENT COMPANY, INC., and HANSON
AGGREGATES NORTH AMERICA,

                Defendants.

**MEMORANDUM-DECISION AND ORDER**

**I.    INTRODUCTION**

On March 11, 2005, the Onondaga Nation filed suit in the Northern District of New York, seeking a declaratory judgment (i) that certain treaties dating from the late 18th and early 19th centuries are null and void, and (ii) that the land conveyed by those agreements remains the property of, and title thereto is held by, the Onondaga Nation and Haudenosaunee, a confederacy of Nations which includes the Onondaga.  See Compl. ¶¶ 6, 44.  An Amended Complaint followed on August 1, 2005, which is the subject of the Motions to dismiss presently before the Court.  Dkt. Nos. 29, 43,

1

45. The Onondaga Nation ("Nation" or "Onondaga") names as Defendants the State of New York and George Pataki,[1] in his individual and official capacity as Governor of New York at the time of filing ("State Defendants"), and the City of Syracuse, Honeywell International, Inc., Onondaga County, Trigen Syracuse Energy Corporation, Clark Concrete Company, Inc., Valley Realty Development Company, Inc., and Hanson Aggregates North America ("Non-state Defendants"). In these grouping, the State Defendants and Non-state Defendants each moved to dismiss the action in its entirety on August 15, 2006. For the reasons that follow, their Motions are granted; and the Onondaga's suit is dismissed with prejudice.

## II.   BACKGROUND

Plaintiff, the Onondaga Nation, is recognized by the United States as an "Indian nation," with a population primarily located on its reservation south of Nedrow, New York. Compl. ¶ 6. The government of the Onondaga Nation, the Onondaga Council of Chiefs, is recognized by the United States through the Secretary of the Interior, and the relationship of the Nation with the United States has never been terminated. Id. The instant action is brought by the Nation both on its own behalf and on the behalf of the Haudenosaunee. According to Plaintiff, the Haudenosaunee is known in English as the "Six Nations Iroquois Confederacy," and it entered into the Treaty of Fort Stanwix of 1784 and the Treaty of Canandaigua of 1794. Id. The Onondagas are the "firekeepers" of the Haudenosaunee, and Plaintiff brings this suit by authority of the Council of Chiefs of the

---

[1] David Patterson serves as the current Governor of New York. Pursuant to Federal Rule of Civil Procedure 25(d), David Patterson is substituted in place of former-Governor George Pataki to the extent that the latter is sued in his official capacity; as Plaintiffs names Pataki as a Defendant in his individual capacity, as well, Pataki remains a party to this action.

Haudenosaunee in addition to that of its own Council of Chiefs.  Id.

The Nation alleges that various lands situated in present-day central New York were unlawfully acquired by the State of New York in violation of the federal Indian Trade and Intercourse Acts, the United States Constitution, the Treaty of Fort Stanwix of 1784, and the Treaty of Canandaigua of 1794.  Am. Compl. ¶ 2.  This action seeks, *inter alia*, an express declaration that such was the case.  The Nation cites as the basis for it claims federal common law; the United States Constitution; the Indian Trade and Intercourse Acts of 1790, 1793, 1796, 1799, 1802, and 1834, codified at 25 U.S.C. §177; the Treaty of Fort Stanwix of 1784, 7 Stat. 15; and the Treaty of Canandaigua of 1794, 7 Stat. 44.  Id.

Given the nature of Plaintiff's claim, the State of New York is sued as the original purchaser of the land in question, which the State continues to partially occupy or claim an interest therein.  Id. ¶ 7.  The Governor is sued in his individual and official capacity, as Plaintiff alleges "he is acting beyond the scope of his constitutional and other authority in unlawfully claiming an interest in the plaintiff's lands."  Id. ¶ 10.  Similarly, Onondaga County, New York and the City of Syracuse are named for occupying or maintaining an interest in some portion of the land.  Id. ¶¶ 11-12.  Honeywell International, Inc. is sued on the same basis; the Nation alleges, in particular, that the corporation has "industrial properties along the southwest shore of Onondaga Lake" which "have degraded the land to which the Onondaga Nation holds title under federal law."  Id. ¶ 13.  The Nation also alleges that Clark Concrete Company, Inc. and Valley Realty Development Company, Inc., the former's subsidiary, occupy or claim an interest in the land and have operated a gravel mine that has impaired and displaced the "head waters of Onondaga Creek" and "areas of extreme archeological and cultural sensitivity for the Onondaga Nation."  Id. ¶ 14.  Hansen Aggregates North

America is sued for occupying or claiming part of the subject land, including property known as "Jamesville quarry," a large open pit mine that has "devastated" the area and "degraded the land to which the Onondaga Nation holds title under federal law." Id. ¶ 15.  Finally, the Nation alleges that Trigen Syracuse Energy Corporation occupies or claims some of the land, a portion of which contains an energy "cogeneration" plant that emits hydrochloric acid and dioxins which have "polluted the air and degraded the land to which the Onondaga Nation holds title." Id. ¶ 16.  In broad terms, Plaintiff describes the aboriginal Onondaga Nation within New York State as being located between the aboriginal land of the Oneida Nation on the east and the Cayuga Nation on the west; it was situated between the St. Lawrence River, along the east side of Lake Ontario and south to the border with Pennsylvania, varying in width from about 10 to 40 miles. Id. ¶ 16.  According to the Nation, this aboriginal zone "has never been sold, ceded, or given up by any Indian nation or entity." Id. ¶ 22.

   The Nation recounts that in September of 1788, individuals claiming to represent the Onondaga Nation negotiated a treaty with the State of New York, resulting in a document purporting to cede and grant to the State of New York all of the Nation's land except for a limited tract which the Nation would retain. Id. ¶ 26.  Plaintiff asserts that neither the Onondaga Nation nor the Haudenosaunee authorized or consented to such a treaty. Id. ¶ 25.  Later, on June 16, 1790, the State of New York entered a treaty with persons claiming to represent the Nation "'ratify[ing] and confirm[ing]' the 1788 'treaty.'" Id. ¶ 29.  Also in 1790, the United States Congress passed the Indian Trade and Intercourse Act governing the purchase of Indian land, which, as re-enacted and codified, has remained in continuous force. Id. ¶ 30.  Plaintiff cites the provision that: "No purchase, grant, lease or other conveyance of land, or of any title or claim thereto, from any Indian

nation or tribe of Indians, shall be of any validity in law or equity, unless the same be made by treaty or conveyance entered into pursuant to the Constitution." Id.; 25 U.S.C. §177.  The Nation contends that the June 16 treaty was ineffective to convey title to any lands, because it could have no legal effect until it was recorded as required by state law, and at the time it was recorded, on November 25, 1791, it was in contravention of the United States Constitution, the Indian Trade and Intercourse Act of 1790, and the Treaty of Fort Stanwix of 1784." Id. ¶ 31.  The treaty concerning the Onondaga territory, according to Plaintiff, was only properly approved by the New York State Act of April 10, 1813, thus rendering the 1788 and 1790 treaties a "nullity" in view of its conflict with the Constitution and the first Indian Trade and Intercourse Act. Id. ¶¶ 32-34.

In 1793, New York entered into another treaty with persons claiming to represent the Nation, whereby two tracts set aside for the Onondaga by the 1790 treaty were released to New York. Id. ¶ 35.  Plaintiff alleges that a third treaty conveying further Onondaga lands "in defiance of Congress's express prohibition set forth in the Indian Trade and Intercourse Act of 1793" followed in 1795 between New York and persons claiming to represent the Nation. Id. ¶ 36.  Later, in 1817, another such treaty was entered into by New York and persons claiming to represent the Nation, conveying away two additional tracts of land set aside by the 1790 treaty. Id. ¶ 37.  In 1822, a fifth treaty was made between the State and persons claiming to represent the Nation, which conveyed another portion of land.

The Nation alleges that the each of the aforementioned treaties "were never approved or ratified by the Onondaga Nation or the Haudenosaunee" and none "were made by persons having authority or legal capacity to convey the land."  Further, the Nation states that the treaties were at no point ratified or approved by the United States, such that "[n]o part of the subject land has ever been

ceded or given up pursuant to a treaty or conveyance entered into under the Constitution nor pursuant to any act of Congress." Id. ¶¶ 39-40. From this premise, Plaintiff contends that "because of the failure of the New York legislature to approve the 'treaties' as required by New York's Constitution and the Act of 1788, and also independently because of the failure to record the 1790 treaty until after the effective date of the United States Constitution and the first Indian Trade and Intercourse Act," the land purported to have been conveyed "remains the property of the Onondaga Nation and the Haudenosaunee." Id. ¶ 41.

Predicated on the alleged defectiveness of these treaties, this action asserts that "[b]ecause the defendants base their claimed interests in the subject lands on the void 'treaties,' the defendants have no lawful interest in the subject land." Id. ¶ 44. The Nation maintains that it has consistently protested New York State's exercise of jurisdiction over the land in question; however, the Nation emphasizes that "federal courts were not open to hear these cases until 1974 at the earliest, and that the prima facie elements of the claims were not upheld until 1985." Id. ¶ 46. Plaintiff also makes reference to practical difficulties in pressing its claims, including "lack of financial resources, lack of access to attorneys, lack of federal court jurisdiction, and an inability to communicate with and understand the English language adequately." Id. ¶ 47. The Nation states that it has nonetheless retained "cultural, spiritual, legal, and political ties to the subject land" and attempted to protect sites of importance from external harms. Id. ¶ 49.

Non-Indians have extensively populated and developed the aboriginal lands subject to the treaties during the many years subsequent to the allegedly illegitimate conveyances. Id. ¶ 50. Plaintiff, however, alleges that New York and the other defendants have known or had reason to know of the Nation's continual claim to ownership. Id. ¶ 52. Indeed, Plaintiff asserts that the State

conducted itself in "bad faith by, among other things, deliberately dealing with individuals who lacked authority to act for the Nation, by deceiving these persons and the Nation about the nature of the transactions, and by ignoring the federal government's explicit warnings not to violate the Trade and Intercourse Act . . . ." Id. ¶ 53.  On the basis of this history, the Nation now seeks a declaratory judgment ruling that "the purported conveyances of the 'treaties' of 1788, 1790, 1793, 1795, 1817, and 1822 were and are null and void" and "the subject land remains the property of the Onondaga Nation and the Haudenosaunee, and that the Onondaga Nation and Haudenosaunee continue to hold title to the subject land." Id.

### III.   DISCUSSION

*a. Standard of Review*

A complaint is subject to dismissal for failure "to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6).  When considering a motion to dismiss pursuant to Rule 12(b)(6), a district court must accept the allegations made by the non-moving party as true and "draw all inferences in the light most favorable" to the non-moving party. In re NYSE Specialists Sec. Litig., 503 F.3d 89, 95 (2d Cir. 2007).  To survive a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Ashcroft v. Iqbal, ___ U.S. ___, 129 S. Ct. 1937, 1949 (2009) (quoting Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 570 (2007)).

*b. Sherrill, Cayuga, and Oneida*

The legal ground on which Plaintiff's claims rest has undergone profound change since the Nation initiated its action on March 11, 2005.  Whatever the viability of the Nation's claims to the

subject lands at the time of filing, the law today forecloses this Court from permitting those claims to proceed.  See County of Oneida v. Oneida Indian Nation, 470 U.S. 226 (1985) (reserving "the question whether equitable considerations should limit the relief available"); Cayuga Indian Nation v. Pataki, 413 F.3d 266, 273 ("The Supreme Court's recent . . . has dramatically altered the legal landscape against which we consider plaintiffs' claims.").

Within weeks of the filing of the instant suit, on March 29, 2005, the Supreme Court issued a decision in the case of City of Sherrill v. Oneida Indian Nation, 544 U.S. 197 (2005), which addressed the Oneida Nation's claim that it need not pay taxes on historic reservation land, pursuant to the 1794 Treaty of Canandaigua, which had been re-acquired in fee.  The Oneidas, like the Onondaga Nation, are direct descendants of one of the nations comprising the Haudenosaunee, and they maintained claims relating to land conveyed by 18th and early 19th century treaties with New York State.  The Oneidas sought "declaratory and injunctive relief recognizing . . . present and future sovereign immunity from local taxation on parcels of land the Tribe purchased in the open market, properties that had been subject to state and local taxation for generations." Id. at 214.  The Court determined that such a "disruptive remedy" was precluded by the "long lapse of time, during which the Oneidas did not seek to revive their sovereign control through equitable relief in court, and the attendant dramatic changes in the character of the properties." Id. at 216-217.  Sherrill considered the practical implications of the Oneidas' claims in light of "standards of federal Indian law and federal equity practice." Id. at 214.  Without identifying precise pre-conditions for an equitable bar to historical land claims, the Court concluded that "the distance from 1805 to the present day, the Oneidas' long delay in seeking equitable relief against New York or its local units, and developments in the city of Sherrill spanning several generations, evoke the doctrines of laches,

acquiescence, and impossibility." Id. at 221. As such, the sought relief was deemed "inequitable." Id.

On June 28, 2005, the Second Circuit decided Cayuga Indian Nation v. Pataki, 413 F.3d 266 (2d Cir. 2005), based on the principles of Sherrill. It ruled that land claims brought by the Cayuga Nation, which derived from late-eighteenth-century treaties with New York State, were equitably barred by the doctrine of laches, as articulated in Sherrill. 413 F.3d at 268. The district court had found that certain treaties between the Cayuga Nation and the New York were not properly ratified by the federal government, rendering them invalid under the Nonintercourse Act, and that the Plaintiff's suit was not otherwise barred; a verdict for Plaintiff was ultimately returned in the amount of $247,911,999.42, reflecting the fair market value of the subject land as well as fair rental value damages for 204 years, plus prejudgment interest. Id. Cayuga overturned this verdict and entered judgment for the defendants, declaring that "if the Cayugas filed this complaint today, exactly as worded, a District Court would be required to find the claim subject to the defense of laches under Sherrill and could dismiss on that basis." Id. at 278.

Broadly, Sherrill was understood to mean that equitable doctrines may appropriately be applied to Indian land claims, "even when such a claim is legally viable and within the statute of limitations." Id. at 273. The Cayuga court determined that "Sherrill's holding is not narrowly limited to claims identical to that brought by the Oneidas, seeking a revival of sovereignty, but rather, that these equitable defenses apply to 'disruptive' Indian land claims more generally." Id. The court concluded that the monetary damages immediately at issue in Cayuga, in part a monetazation of an ejectment claim, did not alter the fact that "plaintiffs' claim is and has always been one sounding in ejectment; plaintiffs have asserted a continuing right to immediate possession

as the basis of all of their claims . . . ." Id. at 274. This underlying "possessory land claim," regardless of the remedy, was found to be plainly disruptive under the principles of Sherrill. "[D]isruptiveness is inherent in the claim itself -- which asks this Court to overturn years of settled land ownership -- rather than an element of any particular remedy which would flow from the possessory land claim." Id. at 275.

The Caygua court made clear that a traditional delineation between actions at law and equity does not stand in the way of Sherrill's concern with, and potential bar to historic, forward-looking claims which disturb existing governance and rights. Id. ("Whether characterized as an action at law or in equity, any remedy flowing from this possessory land claim, which would call into question title to over 60,000 acres of land in upstate New York, can only be understood as a remedy that would similarly "'project redress into the present and future.'" (quoting Sherrill, 544 U.S. at 202)). After determining that the Cayuga's claim was a possessory land claim and that such a claim is subject to the Sherrill formulation of the laches doctrine, the court found that the equitable considerations which had barred the Oneidas' sovereignty and tax claims operated to defeat the Cayugas' action; indeed, these considerations were taken directly from the Sherrill opinion. See id. at 277. No claims by the Cayuga survived this ruling, including their trespass action because "there can be no trespass unless the Cayugas possessed the land in question." Id. at 278.

Recently, on August 9, 2010, the Second Circuit decided Oneida Indian Nation v. County of Oneida, 2010 U.S. App. LEXIS 16426 (2d Cir. Aug 9, 2010) ("Oneida"), a land-claims case wherein the court further articulated the scope and application of its earlier Cayuga decision. The Oneidas asserted a possessory claim to significant acreage in New York State on the basis of invalid treaties and the Nonintercourse Act, and they sought damages for trespass as well as actual

restoration of possession of the subject land. This Court, considering a motion for summary judgment by New York State and named defendant counties, held that the Oneidas' claims predicated on a continuing right to possess the land were equitably barred by laches under Sherrill and Cayuga. See Oneida Indian Nation v. New York, 500 F. Supp. 2d 128 (N.D.N.Y. 2007). Apart from what the Court understood as the plaintiffs' "possessory claims," this Court also ruled that the Oneidas asserted a claim against New York State to reform land sale contracts that were void for unconscionability -- a claim which the Court viewed as non-possessory. Id. On appeal, the Second Circuit affirmed the dismissal of the possessory claims; however, it reversed the Court's ruling on the contract reformation claim, finding that it was barred both by New York's sovereign immunity and by the same equitable defenses articulated in Sherrill and Cayuga because the claim would similarly undermine and disrupt settled land ownership and expectations. Oneida Indian Nation, 2010 U.S. App. LEXIS 16426 at *10.

The Oneida court's analysis began with a restatement of Cayuga's holding on possessory land claims: "[A]ny claims premised on the assertion of a current, continuing right to possession as a result of a flaw in the original termination of Indian title -- are by their nature disruptive and that, accordingly, the equitable defenses recognized in Sherrill apply to such claims." Oneida Indian Nation, 2010 U.S. App. LEXIS 16426 at *34. Turning to Oneidas' possessory claims, regardless of whether the relief sought was ejectment or damages, the court found the case indistinguishable from Cayuga for purposes of a laches defense. Id. at *36.

> Here, as in Cayuga, a tremendous expanse of time separates the events forming the predicate of the ejectment and trespass-based claims and their eventual assertion. In that time, most of the Oneidas have moved elsewhere, the subject lands have passed into the hands of a multitude of entities and individuals, most of whom have no connection to the historical injustice the Oneidas assert, and these parties have

11

> themselves both bought and sold the lands, and also developed them to an enormous extent. These developments have given rise to justified societal expectations (expectations held and acted upon not only by the Counties and the State of New York, but also by private landowners and a plethora of associated parties) under a scheme of "settled land ownership" that would be disrupted by an award pursuant to the Oneidas' possessory claims.

Id. at *37 (citing Cayuga, 413 F.3d at 275).

As Sherrill and Cayuga signaled, the term "laches" serves as "convenient shorthand" for equitable principles which bar possessory claims in such circumstances. Id. at *38, 42 (rather than a true laches defense, Cayuga invoked "distinct, albeit related, equitable considerations"). It "does not focus on the elements of traditional laches but rather more generally on the length of time at issue between an historical injustice and the present day, on the disruptive nature of claims long delayed, and on the degree to which these claims upset the justifiable expectations of individuals and entities far removed from the events giving rise to the plaintiffs' injury." Id. at *39. Thus, in determining whether Sherrill's formulation of "laches" may bar a plaintiff's claims, courts do not need to find an unreasonable lack of diligence by that plaintiff under the circumstances in initiating an action. Id. at *39-42. Nor is this equitable defense limited to "possessory" claims; Oneida states that the "defense is properly applied to bar any ancient land claims that are disruptive of significant and justified societal expectations that have arisen as a result of a lapse of time during which the plaintiffs did not seek relief." Id. at *63-64. Sherrill demonstrates as much in barring the Oneida's action for equitable and declaratory relief as to taxes on land already owned by the Oneidas.

Given the centrality of "disruptiveness" in Sherrill and its express, dispositive role in the Cayuga analysis, the court in Oneida declared that the laches-related defense is "potentially applicable to all ancient land claims that are disruptive of justified societal interests that have

12

developed over a long period of time, of which possessory claims are merely one type, and regardless of the particular remedy sought." Id. at *67. The court then found that the contract-based claim, which this Court had permitted to proceed, falls within this large category by "call[ing] into question the validity of the original transfer of the subject lands and at least potentially, by extension, subsequent ownership of those lands by non-Indian parties . . . ." Id. at *68. Such disruption would necessarily be occasioned by the contract claim because it "amounts to the assertion that the agreement by which the State of New York purported to acquire title was unconscionable," which would render that contract invalid and unenforceable. Id. at *70-71. The claim itself, and the question of what remedy might be fashioned, would thus pose have serious implications for the settled expectations of private land owners, municipalities and New York State.

c. *The Onondaga Claims*

Sherrill, Cayuga and Oneida foreclose any possibility that the Onondaga Nation's action may prevail; the Court is bound by these precedents to find the Nation's claims equitably barred and subject to dismissal. As detailed above, the Onondaga seek declaratory judgment (i) that certain treaties dating from the late 18th and early 19th centuries are null and void, and (ii) that the land conveyed by those agreements remains the property of the Nation. These claims are predicated on assertions that the land in question "has never been sold, ceded, or given up by any Indian," that New York State knew or should have known that its purchases of the land violated the U.S. Constitution, Nonintercourse Act, and federal and pre-constitutional treaties, and that the private named defendants have no lawful interest in the subject land because the their possession rests on such allegedly void treaties. Plainly, the Nation's claims represent the type of inherently disruptive action which Cayuga instructs is barred under Sherrill's formulation of a laches defense. Cayuga,

413 F.3d at 275.  That the Onondaga are pursuing only a declaratory judgment at this juncture is of no matter; the claims themselves expressly seek to undermine the validity of the original transfer of the subject lands and dramatically upset the settled expectations of current land-owners.  While Plaintiff does not request possession or damages in the instant action, the Nation seeks an order by this Court that title to various parcels of land in New York State under public and private ownership belongs to the Onondaga.  Indeed, the declaratory relief sought would apply to all land conveyed by the challenged treaties, despite the Onondaga naming a limited set of Defendants.  It is indisputable that these claims, possessory in nature and sounding in the ejectment of the present owners, are located at the center of the range of claims barred under Cayuga.  Moreover, as Oneida holds, the equitable bar is properly applied to "any ancient land claims that are disruptive of significant and justified societal expectations that have arisen as a result of a lapse of time during which the plaintiffs did not seek relief."  Oneida, 2010 U.S. App. LEXIS 16426, at *63-64.

     The Nation's Complaint asserts claims which are equitably barred on their face.  Cayuga states that, were the Tribe in that case to file "its complaint today, exactly as worded," it would be subject to dismissal "*ab initio*," on the basis of laches.  Cayuga, 413 F.3d at 278.  The Onondagas' action cannot be different, as it evidences the same essential qualities which the Second Circuit found barred the claims in Cayuga and Oneida.  According to Plaintiff's Amended Complaint, the last allegedly invalid treaty conveying a portion of the subject land was effected in 1822.  Thus, approximately 183 years separate the Onondagas' filing of this action from the most recent occurrence giving rise to their claims.  In other words "a tremendous expanse of time separates the events forming the predicate of the . . . claims and their eventual assertion."  Oneida, 2010 U.S. App. LEXIS 16426, at *37.  It follows that throughout the subject land in central New York,

"'generations have passed during which non-Indians have owned and developed the area.'" Cayuga, 413 F.3d at 277 (quoting Sherrill, 544 U.S. at 202). The Court takes judicial notice that the contested land has been extensively populated by non-Indians, such that the land is predominantly non-Indian today, and has experienced significant material development by private persons and enterprises as well as by public entities. Cayuga, 413 F.3d at 277; see FED. R. EVID. 201.

During the long period between the signing of the challenged treaties and the filing of the instant suit, New York State has exercised sovereign control over the subject land, allowing the creation and maintenance of long-settled expectations concerning land ownership in countless innocent purchasers and others. Cayuga, 413 F.3d at 277. That the delay between the Onondagas' action and the allegedly defective conveyances may not be attributed to the Nation but to outside forces, including the actions of federal and state authorities, does not deter the Sherrill laches defense from application in the circumstances of this case. Id. at 279. Oneida explained the equitable bar as focusing "on the length of time at issue between an historical injustice and the present day, on the disruptive nature of claims long delayed, and on the degree to which these claims upset the justifiable expectations of individuals and entities far removed from the events giving rise to the plaintiffs' injury." Oneida, 2010 U.S. App. LEXIS 16426, at *39. These considerations are manifestly present here. As such, the Onondagas' claims are equitably barred under Sherrill and Cayuga.

Given this mandatory basis for dismissing Plaintiff's claims, discovery and further development of the record would be inappropriate and superfluous. The dispositive considerations which compel this Court to dismiss the claims are "self-evident," Oneida Indian Nation, 500 F. Supp. 2d at 136 n.2 (N.D.N.Y. 2007); and the Cayuga court expressly instructs a district court to

15

dismiss a complaint when confronted with one such as the plaintiff Tribe filed in that case. Cayuga, 413 F.3d at 278. The profoundly disruptive nature of the Onondaga Nation's claims is readily identifiable throughout its Amended Complaint, situating those claims well within the scope of the equitable bar outlined by controlling precedent. Therefore, as a matter of law, the Nation's action fails to state a claim for which relief may be granted. In light of the foregoing analysis, the action is dismissed with prejudice.

## IV.  CONCLUSION

**Accordingly**, it is hereby:

**ORDERED**, that the State Defendants' Motion to dismiss (Dkt. No. 43) is GRANTED, and it is further

**ORDERED**, that the Non-state Defendants' Motion to dismiss (Dkt. No. 45) is GRANTED, and it is further

**ORDERED**, that Plaintiff Onondaga Nation's Amended Complaint (Dkt. No. 29) is DISMISSED with prejudice, and it is further

**ORDERED**, that the Clerk serve a copy of this Order on the parties.

**IT IS SO ORDERED.**

DATED:    September 22, 2010
          Albany, New York

_____
Lawrence E. Kahn
U.S. District Judge